**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



**Dated: March 30 2023**

John P. Gustafson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 21-31595 |
| | ) | |
| David G. Childers, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 21-03065 |
| | ) | |
| Michael Rable and | ) | Judge John P. Gustafson |
| Sue Rable, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| David G. Childers, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OF DECISION</u>

This adversary proceeding is before the court on Plaintiffs Michael Rable and Sue Rable's

Complaint to Determine Dischargeability against Defendant David G. Childers. [Doc. #1]. In the

Complaint, Plaintiffs sought a determination that Defendant is liable for any damages arising out

of a home construction contract and that those damages are nondischargeable under 11 U.S.C. §§523(a)(2) and (a)(6).[1]  This proceeding is now before the court for decision after a trial held on September 14, 2022.

The court has jurisdiction over this adversary proceeding under 28 U.S.C. §1334(b) as a civil proceeding arising in or related to a case under Title 11.  The Chapter 7 case and all proceedings in it arising under Title 11, including this adversary proceeding, have been referred to this court for decision. 28 U.S.C. §157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio.  This is a core matter under 28 U.S.C. §157(b)(2)(I).  Venue is proper under 28 U.S.C. §1409(a).

"In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).  The court's findings of fact and conclusions of law are set forth below. *See e.g., Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 710 (6th Cir. 1999).  Whether or not specifically referred to in this Memorandum of Decision, the court has examined all the submitted materials, weighed and observed the demeanor and credibility of the three witnesses, carefully considered all the evidence, and reviewed the entire record of the case in determining the facts pertinent to the case and drawing conclusions therefrom.  Based on that review, and for the reasons set forth below, the court finds Defendant is entitled to judgment in his favor.

### FINDINGS OF FACT

On October 4, 2002, Defendant formed D.G. Childers, Limited, ("Childers Construction"), a limited liability company of which he was the sole member. [Doc. #1, Ex. E, p. 54].  Since that time, he has worked as a self-employed general contractor overseeing or working on the

---

1/  The Complaint also sought a determination of dischargeability under §523(a)(14), [*id.* p. 1], but did not allege any facts or a cause of action under this exception.

2

construction of approximately three or four hundred homes in the Toledo, Ohio area. (Testimony of David G. Childers, September 14, 2022, 11:50:59–51:53 ("Childers Test.")).  Defendant has had an account with Carter Lumber since the late 1990s that he used for construction purposes. (*Id.* at 12:04:30).  Detailed below, Carter Lumber, an important player in this dispute, supplied lumber and other materials for Childers Construction's projects, and usually allowed Childers Construction to make purchases on credit, to be repaid as the project progressed.

At the same time, before January 2018, Childers Construction was building a "spec house"[2] for Toledo Transformation, LLC ("Toledo Transformation"), at 1781 Grand Bay, Oregon, Ohio. (S. Rable Test., 09:45:47).  Toledo Transformation owned this property. (*Id.* at 09:50:30).  The owner of Toledo Transformation was Jeff Savage, Plaintiffs' brother-in-law. (*Id.* at 10:37:05).

Plaintiffs had business relationships with Toledo Transformation.  Mr. Rable, a licensed realtor, assisted Toledo Transformation in purchasing rental properties and occasionally sold one of their homes. (Testimony of Michael Rable, September 14, 2022, 11:11:15 ("M. Rable Test.")).  Mrs. Rable had two companies, OPM Homes and Suzzane Utter Equity Trust.  One of Mrs. Rable's companies provided bookkeeping services for Toledo Transformation, such as overseeing construction of ongoing projects, including the construction at 1781 Grand Bay by Childers Construction. (S. Rable Test., 09:48:11).  There was no evidence presented that Plaintiffs had any ownership interest in Toledo Transformation.

In January 2018, one of Mrs. Rable's companies was working for Toledo Transformation providing bookkeeping services during the construction of the "spec house" at 1781 Grand Bay by

---

2/  Mrs. Rable and Defendant testified a "spec house" is a home built on speculation that it will be sold after it is built. (Testimony of Sue Rable, September 14, 2022, 09:47:10 ("S. Rable Test.")); (Childers Test., 11:54:39); *Bank of Ill. v. Covey* (*In re Shara Manning Props., Inc.*), 475 B.R. 898, 902 (Bankr. C.D. Ill. 2010)("A spec house is one built by the developer in the hope of selling the completed but unoccupied new house to a buyer who is satisfied with the developer's design.").

Childers Construction. (*Id.* at 09:48:00). Mrs. Rable did not specify which one of her companies was working for Toledo Transformation. Mrs. Rable discussed with Toledo Transformation the possibility of building a personal residence on a vacant lot located at 5418 Bay Shore, Oregon, Ohio ("Bay Shore Property"). (*Id.* at 09:45:47). Toledo Transformation owned the Bay Shore Property. (*Id.* at 10:37:53). Following this discussion, Toledo Transformation informed Plaintiffs that Childers Construction could build a personal residence on the Bay Shore Property, with Toledo Transformation funding the construction. (*Id.* at 09:45:47, 09:48:52). Plaintiffs would then purchase the Bay Shore Property from Toledo Transformation. (*Id.*) Toledo Transformation and Plaintiffs entered into a "handshake deal" pursuant to which Toledo Transformation would pay for construction and Plaintiffs would pay Toledo Transformation back after construction was complete. (S. Rable Test., 10:49:40). There was no written contract between Plaintiffs and Toledo Transformation, only an amortization schedule. (M. Rable Test., 11:20:46–21:46). Plaintiffs entered into this handshake agreement partly because Jeff Savage was their brother-in-law. (*Id.*)

Plaintiffs approached Defendant directly about building a personal residence for them on the Bay Shore Property. (S. Rable Test., 09:50:30). Defendant then showed them a house he had previously built and offered to build that same house on the Bay Shore Property if they liked it. (*Id.*) Plaintiffs walked through the house previously built by Defendant and decided to build the same home on the Bay Shore Property. (*Id.*)

On January 12, 2018, Plaintiffs executed an agreement ("Building Contract") hiring Childers Construction to build a personal residence on the Bay Shore Property. [Doc. #1, Ex. A, p. 6]. The Building Contract, prepared by Childers Construction, fixed the price at $247,000.00 payable in five progress payments using a draw system. [*Id.*] The Building Contract also outlined

the specifications and scope of work, as well as the payment schedule.[3]

Plaintiffs did not make any down payment or pay a deposit at the time the Building Contract was executed.[4] Childers Construction bore the initial startup costs.

The Building Contract required Childers Construction to furnish all labors and materials necessary to complete the home under the specifications and scope of work, and in accord with applicable building codes. [*Id.*, p. 6]. Childers Construction also promised to keep the Bay Shore Property free from any liens and to provide "all documentation necessary to provide proof of payment." [*Id.*] Nothing in the Building Contract, including the provision about providing proof of payment, required Childers Construction to provide documentation to support the progress payments. The Building Contract stated that work was to be completed within seven months of a building permit being issued. [*Id.*, p. 7].

Under the draw system, Childers Construction would submit a request for payment certifying work had been completed, and then it would be paid for that work. While it was Plaintiffs decision to approve the progress payments being made, the checks came from Toledo Transformation. The progress payments allocate the draws for the various stages of construction. [*Id.*, p. 17]. Once a portion of the construction project was complete, Childers Construction would get a progress payment. (S. Rable Test., 09:59:29). Plaintiffs were under the impression Defendant

---

3/ With regard to the payment of the contract price, the Building Contract stated:

**CONTRACT PRICE (including commissions)**
PAYABLE IN FIVE DRAWS
1. 20% FOUNDATION
2. 20% FRAMED
3. 30% WALL BOARD IS INSTALLED
4. 20% FINISH TRIM, DOORS, CABINETS
5. 10% UPON FINAL

[*Id.*, p. 17].

4/ The first check under the Building Contract was written on March, 27, 2018.

5

would pay contractors with the progress payments Plaintiffs provided. (*Id.* at 09:52:01–52:30); (M. Rable Test., 10:55:46).

There is no language in the Building Contract that required Childers Construction to use the progress payments solely to pay construction costs for the Bay Shore Property. Progress payments were not dependent on providing proof of payment to subcontractors or for materials. The Building Contract did not specify how much of the contract price was for direct construction costs and how much represented profit. Defendant testified that each progress payment was to include some portion for Childers Construction's profit. (Childers Test., 12:50:11).

Defendant began performing the work in January 2018, but encountered several issues at the outset. (*Id.* at 11:58:16). The Bay Shore Property was in a flood plain, which required constructing the foundation at a certain elevation to put the Bay Shore Property above the flood plain. (*Id.* at 11:55:53–56:32). It also required filing paperwork with the Federal Emergency Management Agency ensuring that certain elevation requirements were met. (*Id.*) Additionally, the Bay Shore Property needed to be rezoned from multifamily to single-family with the City of Oregon, (*id.* at 11:56:32), and there was no sewer tap, which required negotiating with the City of Oregon to provide one. (*Id.* at 11:57:17).

Although the Building Contract provided that the various progress dates would start when the building permit was issued, this was work done before the building permit. (*Id.* at 11:55:26). Childers Construction did not receive any payment for any work done prior to the commencement of construction.

On March 27, 2018, Childers Construction submitted "Draw Request Number 1 of 5," which certified that 20% of the work specified in the Building Contract had been completed, and that $49,400 was due. (Pls.' Trial Ex. F). The draw request did not state that subcontractors or

materialmen had been paid, nor did it state that the payment would be used solely for the Bay Shore Property. Paid receipts were not provided, and Plaintiffs did not request receipts.

After reviewing the request, Plaintiffs concluded that Childers Construction had completed the necessary work, (S. Rable Test., 10:02:52–03:41); (M. Rable Test., 10:55:29), and caused a check from Toledo Transformation to be issued for $49,400 on March 28, 2018. (Pls.' Trial Ex. F). The testimony of Sue Rable was that she signed the check as a 1099 independent contractor of Toledo Transformation.[5] The check was deposited the next day in an account jointly held by Childers Construction and Defendant. (Pls.' Trial Ex. H). This was the first payment Childers Construction and Defendant received.

On April 25, 2018, Childers Construction submitted "Draw Request Number 2 of 5," which certified that 40% of the work had been completed, and that $49,400 was due. (Pls.' Trial Ex. F). The items that were certified as completed included "framing." The draw request did not state that subcontractors or materialmen had been paid, nor did it state that the payment would be used solely for the Bay Shore Property. Paid receipts were not provided, and Plaintiffs did not request receipts.

Again, Plaintiffs reviewed the request and found that Childers Construction had completed the work needed to receive payment. (S. Rable Test., 10:04:05–04:30); (M. Rable Test., 10:55:29). Mrs. Rable wrote another Toledo Transformation check for $49,400 on April 27, 2018, (Pls.' Trial Ex. F), which was deposited in the account jointly owned by Childers Construction and Defendant about two weeks later. (Pls.' Trial Ex. H). This was the second payment Childers Construction and Defendant received.

Defendant and Childers Construction jointly held the bank account, which at times was used for both business expenses and Defendant's personal expenses. (Childers Test., 12:24:43–

---

5/ The signature lines on the checks to Childers Construction are partially redacted. Only the first letter appears. That letter appears to be a cursive "J," but could be another letter.

25:32). Childers Construction was also working on other projects. Checks from that account reflected payments for expenses that had nothing to do with the 5418 Bay Shore Property. (*Id.* at 12:26:43–27:02). For example, on April 24, 2018, the day before the second draw was submitted, Childers Construction made a check to Palmer Excavation. This check was presented twice and returned for insufficient funds on May 1, 2018. (Pls.' Trial Ex. H). The check made to Palmer Excavation was ultimately paid on May 3, 2018. This check was unrelated to the Bay Shore Property. Defendant had a history of making checks to pay expenses on the expectancy that a progress payment on a project would be received shortly after.

On April 30, 2018, Childers Construction purchased $46,795.00 in framing materials from Carter Lumber to be delivered to the Bay Shore Property with a note that said the materials were for "Job 101 & 102." (Pls.' Trial Ex. G); (Childers Test., 12:59:29). Since Defendant was a long-standing customer, he had a ninety-day account with Carter Lumber, which meant that Carter Lumber would not require payment for ninety days. (Childers Test., 12:05:05, 12:50:55). At some point, Childers Construction wrote a check to Carter Lumber for $46,963.59 post-dated to August 1, 2018, about ninety days after the purchase of framing materials for the Bay Shore Property. Defendant then gave the check to the salesperson at Carter Lumber and asked Carter Lumber to hold off on depositing it until Defendant received the fourth progress payment from Plaintiffs. (*Id.* at 12:52:13). Defendant testified that it was not necessary to pay for these materials on April 30, 2018, because payment was not yet due. (*Id.* at 13:00:29).

On May 25, 2018, Childers Construction submitted "Draw Request Number 3 of 5," certifying that 70% of the work had been completed and that $74,100 was due. (Pls.' Trial Ex. F). The relevant construction items certified as completed were: "Rough Plumbing, Rough HVAC, Rough Electrical, Basement and Garage Floors, Insulation, Siding, and Drywall." *Id.* As before,

8

there was no representation regarding the payment to subcontractors or materialmen or the exclusive use of the payment for the Bay Shore Property. Paid receipts were not provided, and Plaintiffs did not request receipts.

Mrs. Rable did not immediately authorize the third progress payment because of some concerns regarding the project. Plaintiffs reviewed "Draw Request Number 3 of 5," (S. Rable Test., 10:04:35); (M. Rable Test., 10:55:29), and responded that, in their view, 70% of the work on the Bay Shore Property was not yet completed. (S. Rable Test., 10:04:05–04:35); (M. Rable Test., 10:55:46). The items that were not completed, which Plaintiffs believed should be completed by the third draw, included "siding," and certain work on the exterior of the house, such as the stone. (S. Rable Test., 10:09:29); (M. Rable Test., 11:05:19). The specifications and scope of work in the Building Contract provided "siding to be dutch lap style vinyl. Stone per print." [Doc. #1, Ex. A, p. 12]. A blueprint was not provided. The parties did not provide any additional evidence about the placement of stone on the Bay Shore Property.

Additionally, the roofer working on the Bay Shore Property contacted Plaintiffs seeking payment for completed work, (S. Rable Test., 10:05:15–06:12), and Plaintiffs began to suspect that Childers Construction was using funds from the Building Contract to complete work on the other Toledo Transformation house located at 1781 Grand Bay. (M. Rable Test., 10:55:46). They noted that work at 1781 Grand Bay increased when Childers Construction received payments from work done at the Bay Shore Property. (*Id.*) Mrs. Rable acquired this suspicion because she was Toledo Transformation's bookkeeper and also provided Childers Construction progress payments for construction on the 1781 Grand Bay property. (*Id.*)

Defendant testified that the vinyl siding on the exterior of the Bay Shore Property had been finished, but the stone had not been completed because the stone was to be done after the siding.

(Childers Test., 12:00:47–01:38).

Despite these concerns, and their knowledge about a contractor going unpaid, Plaintiffs ultimately authorized the third progress payment from Toledo Transformation of $74,100.00. (M. Rable Test., 11:05:19). Mr. Rable stated that the payment was made to keep the peace between the parties and to keep the project going. (*Id.* at 10:55:46); (S. Rable Test., 10:05:15). This check for $74,100.00 was tendered on June 13, 2018, almost three weeks after the submittal of "Draw Request Number 3 of 5." (Pls.' Trial Ex. F). On June 14, 2018, the third check was deposited. (Pls.' Trial Ex. H).

As before, Childers Construction immediately made checks to pay subcontractors who worked on the Bay Shore Property. On June 14, 2018, for example, Childers Construction issued checks to Lee's Plumbing Inc. for $6,260.00, Impact Electrical LLC for $7,980.00, and Hauling Houses Siding for $2,772.50. (Childers Test., 12:42:20–42:49). The memo line on these checks stated "5418." Defendant wrote "5418" for checks related to the 5418 Bay Shore property, unless there was an invoice number. (*Id.* at 12:32:20).

Childers Construction also issued checks to pay expenses for the Bay Shore Property. The memo line for some of these checks stated "1781," presumably for the 1781 Grand Bay property, also owned by Toledo Transformation. (*Id.* at 12:43:23).

Work on the Bay Shore Property continued after June 13, 2018, but progress began to slow down. (S. Rable Test., 10:10:15); (M. Rable Test., 11:02:46–3:00). Contractors were not showing up because they were not being paid. (M. Rable Test., 10:57:47). Contractors working on the Bay Shore Property began looking for Childers Construction to get paid. (S. Rable Test., 10:06:44). Plaintiffs reached out to other contractors and got the same story: Childers Construction was not paying contractors on a timely basis. (M. Rable Test., 10:57:47).

Plaintiffs had several conversations with Defendant. (S. Rable Test., 10:06:44). Because contractors were not getting paid, Plaintiffs made multiple requests for receipts that would prove materials had been paid for. (*Id.* at 10:05:15); (M. Rable Test., 10:58:59). Mrs. Rable even offered to help Childers Construction pay contractors because it is what she did for a living. (S. Rable Test., 10:06:44). Defendant however assured her he would take care of the problems. (*Id.*) No other proof was offered regarding any representation that was made by Defendant about payments to subcontractors or the existence of outstanding debts.

During one conversation, Defendant informed Plaintiffs that contractors were working on the Bay Shore Property. (M. Rable Test., 11:03:00). Plaintiffs however were at the Bay Shore Property and told Defendant nobody was there. (*Id.*)

The relationship between the parties deteriorated. Yet work continued. (Childers Test., 12:08:55–10:10). Work on the stone was in progress. (*Id.* at 12:08:55). Defendant started, but did not complete, the finish trim, doors, and cabinets portion of the project. (S. Rable Test., 10:08:18). Additional materials from Carter Lumber were also purchased. (Childers Test., 12:17:09, 12:56:06). On June 26, 2018, Childers Construction made a check to Steve's Drywall for $10,680.00. (Pls.' Trial Ex. H). The memo line on this check stated "5418." Defendant also paid for the stone and paid the subcontractor who poured concrete. (S. Rable Test., 10:21:32–21:45).

Around the end of July or the beginning of August 2018, the fourth draw was submitted based on approximately 90% of the house having been completed. (Childers Test., 12:06:07). Plaintiffs told Defendant they would authorize payment, but then later told Defendant they were not going to authorize the fourth progress payment. (*Id.* at 12:18:22). Plaintiffs informed Defendant they would not make a payment because Plaintiffs had gotten wind that bills were not being paid. (Childers Test., 12:07:30). They also asserted that 90% of the work was not completed.

21-03065-jpg   Doc 23   FILED 03/30/23   ENTERED 03/30/23 16:26:10   Page 11 of 49

(M. Rable Test., 11:04:29). Further, Plaintiffs informed Defendant that if receipts for materials were not provided, they would take over the project. (*Id.* at 11:03:55). Defendant testified he did not keep receipts. (Childers Test., 12:54:46). Defendant never provided Plaintiffs with receipts. The relationship essentially ended at this point.

Defendant stated he did not understand why things went sour because work was ongoing. (*Id.* at 12:56:47).

With the relationship terminated, Mrs. Rable contacted the subcontractors Childers Construction had used and informed them if they finished the job, Mrs. Rable would pay them directly so that they would not have to go through Childers Constructions. (S. Rable Test., 10:42:43). She testified that about 20–30% of the job remained to be completed. This included, among other things, appliances, finishing the painting, fireplace, screens, shower, irrigation system, stone, grading, and plumbing. (*Id.* at 10:44:09). Plaintiffs completed the construction of the house, which cost them approximately $72,775.52. (*Id.* at 10:11:14–13:43). This amount does not include approximately $7,000 allocated to Mrs. Rable's work overseeing completion of the project. It also does not include monies that remain due to subcontractors or materialmen, such as Carter Lumber.

Childers Construction did not receive the final two progress payments under the Building Contract, which was for 30% of the remaining work. The fourth draw, or progress payment, under the Building Contract constituted 20% of the total contract price, which would have been $49,400.00. The fifth and final draw under the Building Contract constituted 10% of the total contract price, which would have been $24,700.00. The total remaining payments that would have been due under the Building Contract totaled $74,100.00.

On or about August 24, 2018, Carter Lumber presented the check in the amount of

$46,963.59 for the framing materials purchased on April 30, 2018. This check was returned for insufficient funds and was never honored. (Childers Test., 12:39:14–39:16). Carter Lumber resubmitted this check for payment multiple times. (*Id.* at 12:39:06–39:11).

Defendant testified that he could not pay Carter Lumber because he did not get a fourth progress payment from Plaintiffs for the balance owed. (*Id.* at 12:10:23).

During this time, Defendant talked to Carter Lumber about the amount owed. (*Id.* at 12:11:40). Defendant made a payment of $1,500.00 and Carter Lumber informed him it would go after Plaintiffs. (*Id.*) Defendant made this payment after submitting the fourth draw. (*Id.* at 12:11:53).

On September 19, 2018, Childers Construction filed a lien on the Bay Shore Property. Defendant stated that he filed this lien because he was owed money. (Childers Test., 12:12:10). At the time the lien was filed, Defendant was unaware Toledo Transformation owned the Bay Shore Property. (*Id.* at 12:13:00–13:26). The lien of Childers Construction was later removed. (S. Rable Test., 09:52:46).

On October 4, 2018, Carter Lumber filed its claim of lien for $71,018.38. [Doc. #1, Ex. C, pp. 19–27].

On October 11, 2018, Toledo Transformation transferred the Bay Shore Property to Mrs. Rable by quitclaim deed. (Pls.' Trial Ex. C). Apparently, no title search was done prior to the transfer.

On October 15, 2018, Plaintiffs granted Toledo Transformation a mortgage to secure payment of $395,000.00. [Doc. #1, Ex. C, p. 41]. According to Mr. Rable, this lien was not an "official" mortgage. (M. Rable Test., 10:53:40). However, the mortgage appears on a title report. [Doc. #1, Ex. C, p. 32]. There was apparently no note associated with the mortgage obligation.

Mr. Rable testified that the mortgage to secure $395,000.00 was to protect Toledo Transformation. (*Id.* at 11:13:40, 11:18:26). Plaintiffs had a handshake agreement with Toledo Transformation to pay a certain amount based on an amortization schedule. (*Id.* at 11:13:40–14:37). The $395,000.00 was not the actual amount owed to Toledo Transformation. (*Id.* at 11:20:46).

At some point, Universal Marble & Granite, LLC filed a claim of lien on the Bay Shore property. (S. Rable Test., 10:44:41). Universal Marble & Granite, LLC was owed approximately $4,660.81. (Pls.' Trial Ex. D). No other liens were filed.

Plaintiffs moved into the Bay Shore Property. (*Id.* at 11:09:51); (S. Rable Test., 10:35:03). Plaintiffs were not sure when they moved in, but believed it was late summer or beginning of fall of 2018. (M. Rable Test., 11:10:22).

On December 11, 2018, Carter Lumber filed an action in state court alleging breach of contract, unjust enrichment,[6] and foreclosure of a construction lien against, among others, Toledo Transformation, Plaintiffs, Defendant, and Childers Construction. [Doc. #1, Ex. C, p. 19]. Mrs. Rable stated that they do not believe they owe Carter Lumber because they would be paying twice for the same material. (S. Rable Test., 10:32:11).

---

6/ Carter Lumber's claims, including its pursuit of unjust enrichment against Mrs. Rable, hinges on Defendant's personal liability. Ohio law, for example, allows a subcontractor or materialman to pursue unjust enrichment as a theory of liability against a property owner, "however, the general contractor must be both unavailable for judgment and unable to pursue the owner for the payment the subcontractor seeks." *Carter-Jones Lumber Co. v. Oro RB SPE Owner, LLC*, 2021 WL 2592531 at *6, 2021 U.S. Dist. LEXIS 117835 at *30 (S.D. Ohio June 24, 2021). "This is because the unjust enrichment claim 'will not lie when the possibility exists that either the subcontractor could make a double recovery or the property owner could pay twice for the same performance.'" *Id.* (alteration omitted)(quoting *Booher Carpet Sales, Inc. v. Erickson*, 1998 WL 677159 at *6, 1998 Ohio App. LEXIS 4643 at *17 (Ohio Ct. App. Oct. 2, 1998)). Recovery against a property owner generally depends on the "availability" of a judgment against a general contractor. *Oro Cap. Advisors, LLC v. Borror Constr. Co., LLC*, 2022 WL 3026862 at *11, 2022 U.S. Dist. LEXIS 136772 at *30 (S.D. Ohio Aug. 1, 2022). "Bankruptcy, for instance, has been recognized as rendering a party unavailable for judgment and not precluding a claim for unjust enrichment." *Id.*; *see also, Coyne v. Hodge Constr., Inc.*, 2004 WL 298688 at *2, 2004 Ohio App. LEXIS 677 at *5 (Ohio Ct. App. Feb. 18, 2004)(upholding the dismissal of an unjust enrichment claim because the general contractor was available for judgment, remained a party to the suit, and "there was no indication on the record that the general contractor has filed for bankruptcy"); *Booher*, 1998 WL 677159 at *6, 1998 Ohio App. LEXIS 4643 at *17–18 ("In this case, there is no question that Brandabur's bankruptcy left that company unable to pay Booher. Moreover, Brandabur could not seek further payments from Erickson because it did not complete the house."). Through the order of discharge, Defendant extinguished personal liability except for any debts declared nondischargeable.

On September 8, 2021, Defendant filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. [Bankr. No. 21-31595, Doc. #1]. On September 21, 2021, Defendant filed schedules listing Mr. Rable and Carter Lumber as holding unsecured claims. [Bankr. No. 21-31595, Doc. #7, Schedule E/F: Creditors Who Have Unsecured Claims]. On November 17, 2021, the Chapter 7 Trustee filed a report of no assets. Accordingly, no notice to file claims [Official Form B 2040] was issued, and claims were not filed.

On December 21, 2021, Plaintiffs filed the Complaint. [Doc. #1].

On January 6, 2022, the court entered the Order of Discharge. [Bankr. No. 21-31595, Doc. #13].

On January 21, 2022, Defendant filed an Answer to the Complaint asserting certain affirmative defenses. [Doc. #5].

Although the court will address the issues presented by the parties, there are some facts that would present additional hurdles for Plaintiffs' case. Specifically, prior to the sale of the Bay Shore Property to Plaintiffs,[7] the Bay Shore Property was owned by Toledo Transformation, and all monies paid to Defendant were funds from Toledo Transformation. While Defendant did not assert, as an affirmative defense, that Plaintiffs lack standing or are not the proper party to bring this action, no evidence was presented as to the assignment to Plaintiffs of any claims that may have belonged to Toledo Transformation. Moreover, one of the primary arguments made by Plaintiffs was that Defendant was misusing monies on the Bay Shore Property—this would mean Defendant misused Toledo Transformation's monies because some were applied to Toledo Transformation's other property.

---

7/ One might argue Toledo Transformation's conveyance to Mrs. Rable by quitclaim deed possibly gave her a right to payment from Defendant because of the liens filed against the Bay Shore Property. However, because this was not fleshed out during the trial, the court will not address it.

Additionally, while Defendant did not raise the issue, the "handshake deal" between Plaintiffs and Toledo Transformation for reimbursement may not have been enforceable, at least as a contract, under Ohio law. *See,* Ohio Rev. Code §1335.05 (Ohio's statute of frauds).

Nevertheless, based on the "party presentation principle," the court will address the issues and arguments presented at trial. *See, Greenlaw v. United States*, 554 U.S. 237, 243 (2008)("That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

## LAW AND ANALYSIS

A discharge under Chapter 7 of the Bankruptcy Code generally relieves the debtor from all prebankruptcy liabilities, except as provided in section 11 U.S.C. §523(a). *Kontrick v. Ryan*, 540 U.S. 443, 447 (2004); *Stamper v. United States* (*In re Gardner*), 360 F.3d 551, 557 (6th Cir. 2004). Plaintiffs' Complaint asserts two of those exceptions under §523(a): (1) the debt should be excepted from discharge because of Defendant's fraud, false pretenses, and false statements under §523(a)(2)(A); and (2) the debt should be excepted from discharge because of Defendant's willful and malicious conduct under §523(a)(6).

The main purpose of bankruptcy is to grant a "fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007). Because the bankruptcy discharge is central to a "fresh start," discharge exceptions "are to be strictly construed against the creditor and liberally in favor of the debtor." *Risk v. Hunter* (*In re Hunter*), 535 B.R. 203, 212 (Bankr. N.D. Ohio 2015)(citations omitted); *see also, Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 275 (2013)("[E]xceptions to discharge should be confined to those plainly expressed." (citation omitted)(internal quotation marks omitted)); *Bd. of Trs. v. Bucci* (*In re Bucci*), 493 F.3d 635, 642 (6th Cir. 2007)("[E]xceptions to discharge in §523(a) must be narrowly construed." (citing *Meyers v. IRS* (*In re Meyers*), 196 F.3d 622, 624 (6th Cir. 1999); *XL/Datacomp, Inc. v. Wilson* (*In re*

16

*Omegas Grp., Inc.*), 16 F.3d 1443, 1452 (6th Cir. 1994))); *Leonard v. RDLG, LLC* (*In re Leonard*), 644 F. App'x 612, 618 (6th Cir. 2016)("We construe those exceptions narrowly to promote the central purpose of the discharge—a fresh start for debtors."). A creditor bears the burden of proving by a preponderance of the evidence that a debt is excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 290–91 (1991); *Conti v. Arrowood Indem. Co.* (*In re Conti*), 982 F.3d 445, 448 (6th Cir. 2020).

## I.     <u>The Debt</u>

Plaintiffs' Complaint asked this court to declare a debt nondischargeable. [Doc. #1, p. 5]. However, Plaintiffs' request shifted during closing argument. Plaintiffs asked this court to find that the amount Carter Lumber is suing Plaintiffs to recover is nondischargeable.

"Whether a debt is nondischargeable under 11 U.S.C. §523(a) is a matter separate from the merits of the debt itself." *Long v. Piercy* (*In re Piercy*), 21 F.4th 909, 918 (6th Cir. 2021). A dischargeability action encompasses two distinct claims: "(1) whether a debt is owed, and (2) whether it is dischargeable . . ." *Id.* (citing *Sill v. Sweeney* (*In re Sweeney*), 276 B.R. 186, 195–96 (B.A.P. 6th Cir. 2002)); *see also, Kyle-Wolf v. McClure* (*In re McClure*), 625 B.R. 733, 738 (Bankr. C.D. Ill. 2021). There must be a prepetition debt owed by a debtor because the exceptions to discharge do not provide a creditor with a cause of action that simultaneously creates a debt and renders it nondischargeable. *See, In re McClure*, 625 B.R. at 738 ("A prepetition judgment evidencing the debt would satisfy the [establishment of a valid prepetition debt owed by a debtor].");  *Walker v. Vanwinkle* (*In re Vanwinkle*), 562 B.R. 671, 678 (Bankr. E.D. Ky. 2016).

Plaintiffs do not hold a prepetition judgment against Defendant. A debt has not been liquidated. So the issue is whether Defendant owes a debt to Plaintiffs.

Defendant contends that he is not personally liable because the Building Contract was between Plaintiffs and Childers Construction and not with Defendant individually. In response,

Plaintiffs argued the evidence met the elements under *Bucyrus-Erie Co. v. Gen. Prod. Corp.*, 643 F.2d 413 (6th Cir. 1981) to establish Defendant's personal liability.

The evidence was sufficient to establish Defendant's direct liability under the *alter ego* theory, which treats two parties as one and the same. *See, Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 930 (6th Cir. 2020); *Brennan v. Slone* (*In re Fisher*), 296 F. App'x 494, 505–06 (6th Cir. 2008)("Under Ohio's *alter ego* doctrine, where the stock of a corporation is owned entirely by one party, and the party in interest is the stockholder, the fiction of the separate entity of the corporation may be disregarded where the ends of justice require it." (citation omitted)(internal quotation marks omitted)). In Ohio, courts consider a list of nonexclusive factors in deciding whether to disregard the corporate form.[8] Here, Defendant, as the managing member and principal employee of Childers Construction, diverted some construction funds for personal expenses. The formalities of a separate business entity were also disregarded. As such, Childers Construction was an extension of Defendant himself, and should be considered his *alter ego*.[9]

Whether a debt is owed to Plaintiffs is one problematic aspect, if not the most problematic

---

8/ Some of these factors include:

> (1) grossly inadequate capitalization, (2) failure to observe corporate formalities, (3) insolvency of the debtor corporation at the time the debt is incurred, (4) shareholders holding themselves out as personally liable for certain corporate obligations, (5) diversion of funds or other property of the company property for personal use, (6) absence of corporate records, and (7) the fact that the corporation was a mere facade for the operations of the dominant shareholder(s).

*Bash v. Textron Fin. Corp.*, 524 B.R. 745, 753 (N.D. Ohio 2015)(citing *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005); *Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir. 2001)).

9/ The Ohio case law appears to suggest that there is some disagreement about an "alter ego" theory of liability being a "distinct remedy. . . ." *See, Bavely v. Daniels* (*In re Daniels*), 641 B.R. 165, 196 n.18 (Bankr. S.D. Ohio 2022)(noting the disagreement). Piercing the corporate veil however does not require fraud. *See e.g., Denny v. Breawick, LLC*, 137 N.E.3d 578, 585–87 (Ohio Ct. App. 2019)(affirming the trial court's conclusion to pierce the corporate veil, in part, for "illegal acts" under Ohio's Home Construction Service Law). Additionally, the scope of liability is not limited to piercing the corporate veil; a corporate officer can be held personally liable for a tort committed while acting within the scope of his employment under Ohio agency law. *See e.g., Cash Am. Fin. Servs. v. Fox* (*In re Fox*), 370 B.R. 104, 113 (B.A.P. 6th Cir. 2007). Ultimately, this court finds it unnecessary to wade through the nuances of Ohio law on this issue of liability because the evidence does not establish any debt would be excepted from discharge.

aspect, of this case. The issue inherent in the record of the case is whether Plaintiffs are creditors "to whom such debt is owed . . . ." 11 U.S.C. §523(c)(1). Toledo Transformation, not Plaintiffs, provided the funds to build the Bay Shore Property. Thus, the question is whether this "debt" should be expanded to include Plaintiffs and the injury inflicted on them, if any, by Defendant.

A "creditor" is defined in the Code as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." §101(10)(A). A "debt" is a "liability on a claim," §101(12), a "claim" is defined in turn as a "right to payment," §101(5)(A), and a "right to payment," the Supreme Court has said, "is nothing more nor less than an enforceable obligation." *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998)(quoting *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990)); *see also, Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)("Congress intended . . . to adopt the broadest available definition of 'claim.'"). Thus, an entity with a right to payment that arose prepetition is a creditor that has standing to seek a determination that a debt is excepted from discharge. *See*, §523(c)(1); Fed. R. Bankr. P. 4007(a).

Here, Plaintiffs were obligated to establish a debt owed to Plaintiffs that was obtained by fraud. The record before the court established that Toledo Transformation owned the Bay Shore Property during the period of construction, and also funded the costs for construction. Plaintiffs did not personally pay Defendant any money. Jeff Savage was the sole owner of Toledo Transformation. (S. Rable Test., 10:37:05–37:53). Mrs. Rable's company worked for Toledo Transformation as an independent contractor. (*Id.* at 10:35:28–35:52). She had no interest in Toledo Transformation. (*Id.*)

Moreover, Plaintiffs only had a "handshake agreement" with Toledo Transformation that was not in writing. (M. Rable Test., 10:49:33). Pursuant to this agreement, Toledo Transformation would pay for building the home, and Plaintiffs would pay Toledo Transformation back. (*Id.* at

10:49:15–49:23). Furthermore, Toledo Transformation transferred the Bay Shore Property to Mrs. Rable, and not Mr. Rable, by quitclaim deed months after the last payment was made to Childers Construction. Then, Plaintiffs gave a mortgage that stated it was securing $395,000.00.

The general rule is that a corporation is a separate and independent legal entity. *Coughlin Chevrolet, Inc. v. Thompson* (*In re Thompson*), 458 B.R. 409, 418 (Bankr. S.D. Ohio 2011). The rights and claims of a corporation belong to the corporation and not to its shareholders. *See, Lowe v. Bowers* (*In re Nicole Gas Prod., Ltd.*), 916 F.3d 566, 569 (6th Cir. 2019)("When an artificial entity (a corporation) is injured, shareholders cannot necessarily redress that injury themselves." (citing 19 Am. Jur. 2d *Corporations* §1935 (1998))). Be that as it may, Mrs. Rable was not a member of Toledo Transformation. Instead, one of her companies was an independent contractor for Toledo Transformation. The right to recover appears to belong exclusively to Toledo Transformation.

The "handshake agreement" between Plaintiffs and Toledo Transformation is likely unenforceable as it pertains to the right to recover from Defendant. Toledo Transformation had its own separate assets, and those assets were used to make the payments. Absent documentation stating otherwise, the debt is likely owed to Toledo Transformation.

Toledo Transformation transferred the Bay Shore Property to Mrs. Rable, and not Mr. Rable. Defendant filed schedules listing Mr. Rable, and not Mrs. Rable, as holding an unsecured claim. The somewhat convoluted circumstances that underlie the debt and the lack of clarity of Plaintiffs' status as creditors presents a difficult question. Possibly, Mrs. Rable has a right to payment from Defendant because of Carter Lumber's unjust enrichment claim in the state court proceeding. Toledo Transformation's rights as to the real estate itself were transferred to Mrs. Rable by quitclaim deed. But Mrs. Rable took the Bay Shore Property subject to existing liens.

This court finds it unnecessary to resolve this difficult issue. Even if Plaintiffs are creditors of Defendant under some legal or equitably theory, their claims under §523(a)(2)(A) and §523(a)(6) nonetheless fail.

The court next determines whether any debt is nondischargeable under §523(a) based on the assumption that Defendant is liable to Plaintiffs under some legal or equitable theory.

**II.** **11 U.S.C. §523(a)(2)(A)**

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension renewal, or refinancing of credit to the extent obtained by"[10] false pretenses, a false representation, or actual fraud. *See, Kraus Anderson Cap., Inc. v. Bradley* (*In re Bradley*), 507 B.R. 192, 205 (B.A.P. 6th Cir. 2014); *First Citizens Nat'l Bank of Upper Sandusky v. Mann* (*In re Mann*), 646 B.R. 444, 455 (Bankr. N.D. Ohio 2022). Plaintiffs' claim is based on alleged fraudulent conduct and misrepresentations by Defendant regarding the Building Contract.

"Under §523(a)(2)(A), false representations and false pretenses encompass statements that falsely purport to depict current or past facts." *In re Mann*, 646 B.R. at 455 (citation omitted)(internal quotation marks omitted). "Actual fraud" is a broader ground for excepting a debt from discharge and encompasses frauds that do not depend on a misrepresentation. *In re Mann*, 646 B.R. at 455; *In re Hunter*, 535 B.R. at 212. "Actual fraud" includes any "deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another." *Mellon Bank, N.A. v. Vitanovich* (*In re Vitanovich*), 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001). The court will examine false representations, false pretenses, and actual fraud *seriatim* as separate yet related concepts that share common elements needed to prove nondischargeability.

---

10/ Enacted in 1984, the Bankruptcy Amendments and Federal Judgeship Act added the phrase "to the extent obtained by" to §523(a)(2).

### A. False Representation

To except a debt from discharge for "a false representation," a creditor must prove the following:

> (i) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;

> (ii) the debtor intended to deceive the creditor;

> (iii) the creditor justifiably relied on the false representation; and

> (iv) its reliance was the proximate cause of the loss.

*Rembert v. AT & T Universal Card Servs., Inc.* (*In re Rembert*), 141 F.3d 277, 280–81 (6th Cir. 1998)(footnote omitted). Failure to meet any one of these prongs defeats the claim.

> i. <u>Did the Debtor Obtain Money Through a Material Misrepresentation that, at the Time, the Debtor Knew was False or Made with Gross Recklessness as to Its Truth?</u>

The first prong under *Rembert* has three basic elements. A creditor must prove that: "(a) the debtor received money; (b) the money *was obtained by* use of a material misrepresentation by the Defendant to Plaintiffs; and (c) the Defendant knew at the time of the representation that the representation was not true or was reckless in failing to determine its veracity." *Helber v. Cline* (*In re Cline*), 639 B.R. 452, 459 (Bankr. S.D. Ohio 2022)(citing *Haney v. Copeland* (*In re Copeland*), 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003)).

> a. Did the Debtor Receive Money?

The first inquiry is whether Defendant received money. Plaintiffs must show "the debtor directly or indirectly obtained some tangible or intangible financial benefit as a result of his misrepresentation." *Brady v. McAllister* (*In re Brady*), 101 F.3d 1165, 1172 (6th Cir. 1996). Here, Defendant obtained a financial benefit in the amount of $172,000.00 through Childers Construction, the company he solely owned. Further, a portion of the proceeds were funneled toward personal expenses. *See, id.* (affirming the finding that debtor obtained money when the

misrepresentation infused a corporation that debtor controlled with $40,000.00). Thus, this court finds Plaintiffs met their burden of proving Defendant obtained money by a preponderance of the evidence.

> b. Was Money Obtained by Use of a Material Misrepresentation?

The second inquiry is whether Defendant obtained the money by a material misrepresentation. *See, Ott v. Somogye* (*In re Somogye*), 2020 WL 1519315 at *4, 2020 Bankr. LEXIS 824 at *9 (Bankr. N.D. Ohio Mar. 30, 2020)(Whipple, J.); *In re Copeland*, 291 B.R. at 761. Generally, the inquiry for a "material misrepresentation" is three-fold. *See, In re Somogye*, 2020 WL 1519315 at *4, 2020 Bankr. LEXIS 824 at *9. "Was that debt incurred based on a representation? Was that representation material? Was it false?" *Id.*

There must be a "representation," which is a statement about an existing or past fact; exaggerations, "mere puffery," an expression of opinion, or prediction of the future will not suffice. *Id.* Plaintiffs mainly testified that Defendant failed to follow through with certain contractual promises. (S. Rable Test., 09:52:01–52:30, 10:05:15, 10:58:59); (M. Rable Test., 10:55:46). Breaching a contract is not fraud, but a promise can be actionable as fraud if the contractual promise is made with no intention to perform. *See, In re Somogye*, 2020 WL 1519315 at *5, 2020 Bankr. LEXIS 824 at *9–10. Accordingly, this court will analyze these contractual promises below in determining whether Defendant "knew the representation was false or made it with gross recklessness as to the truth." *See e.g., In re Somogye*, 2020 WL 1519315 at *10, 2020 Bankr. LEXIS 824 at *27 (analyzing whether the debtor made the "promise" knowing it was false or with gross recklessness as to its truth).[11]

---

[11] These are related yet distinct analyses. They are distinct because the analysis of the specific representations differ. A debtor's promise or statement regarding his future intention in a contract may constitute a false representation. *See e.g., SJR Real Est., L.L.C. v. Hendrickson* (*In re Hendrickson*), 2012 WL 646287 at *5–6, 2012

Turning to the representations about an existing or past fact. Plaintiffs' Complaint alleged "Defendant made false representations that payments for the work being performed were being used to fulfill payment obligations for the materials and subcontractors completing work on that portion of the construction contract, and for the work completed." [Doc. #1, ¶17]. Statements about the amount of work completed and payment to subcontractors and materialmen qualify as representations of past or existing facts. *See e.g., 4200 Laclede Corp. v. Green* (*In re Green*), 416 B.R. 657, 660 (Bankr. E.D. Mo. 2009); *Augustine v. Pare* (*In re Pare*), 2010 WL 2765263 at *4, 2010 Bankr. LEXIS 2250 at *14 (Bankr. D. Md. July 12, 2010); *In re Hendrickson*, 2012 WL 646287 at *7, 2012 Bankr. LEXIS 744 at *27 ("[B]y submitting draw requests for the work identified therein, Defendant represented that such work had been performed pursuant to the plans and specifications set forth in the parties' Contract, when in fact, it had not.").

Childers Construction and Defendant received three progress payments for completed work. Plaintiffs did not dispute the first two requests for payment.[12] (S. Rable Test., 10:03:25–04:26); (M. Rable Test., 10:55:29). The Building Contract did not have a provision restricting the use of funds. While there was a contractual requirement to provide receipts, there was no evidence

---

Bankr. LEXIS 744 at *19–23 (Bankr. D. Colo. Feb. 28, 2012)(analyzing whether the allegations in the complaint, that debtor knowingly and intentionally misrepresented a promise to construct the building, with no intention of performing, and that debtor did so with the intention of inducing creditor into entering the contract, stated a claim for fraud in the inducement under §523(a)(2)(A)). On the other hand, a statement about completed work, for example, to induce a creditor to pay for the work, which in fact was not performed or completed, may also constitute a false representation. *See e.g., Bosman v. Glod* (*In re Glod*), 528 B.R. 517, 529–30 (Bankr. N.D.N.Y. 2015)(analyzing whether debtor made representations to creditor regarding a "final draw" on creditor's construction loan, when in fact, that draw was not final); *In re Hendrickson*, 2012 WL 646287 at *6–7, 2012 Bankr. LEXIS 744 at *24–28 (analyzing whether the allegations in the complaint, that debtor's misrepresentations in the draw requests that work had been completed, stated a claim for fraudulent misrepresentation under §523(a)(2)(A)). Notable in this case is the fact that there was no "down payment" prior to Defendant starting work. This fact weighs heavily against any finding of fraudulent intent at the time the parties executed the Building Contract.

12/ The second draw request on April 25, 2018, certified "framing" was complete. The evidence presented shows framing materials were purchased on April 30, 2018. It is not the court's role to research or construct legal or factual arguments on behalf of either party, nor is it appropriate to do so. *Grover v. BMW of N. Am., LLC*, 581 F. Supp. 3d 930, 950 (N.D. Ohio 2022). But even if the representation that framing was complete was false, the court notes framing appears to have been completed before the third draw request.

24

that Plaintiffs requested them in connection with the first three requested draws. Thus, the first two draws in the total amount of $98,800.00 were not obtained by a material misrepresentation.

This leaves the $74,100.00 in the third request for payment, which is disputed. The third draw request certified "70% of the work specification in the above referenced Building Contract has been completed and there is now due and payable to Contractor the sum of $74,100." Further, the construction items that were described as completed included "Rough Plumbing, Rough HVAC, Rough Electrical, Basement and Garage Floors, Insulation, Siding, and Drywall."

The draw request stated the required work at this stage of the Building Contract has been completed. When a document is incorporated into a contract by reference, both must be read together. *See, New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 522 (6th Cir. 2022). The alleged misrepresentation is thus whether the statement about the work having been completed was false, and influenced Plaintiffs to agree that Defendant should be paid for the work.

Plaintiffs testified "siding" was not complete despite the certification in the third draw request stating it was. Plaintiffs further testified "siding" was started but not completed because "siding" included the stone portion of the house. (S. Rable Test., 10:09:23); (M. Rable Test., 11:05:19). The Building Contract provides "siding to be dutch lap style vinyl. Stone per print." A blueprint was not included in the exhibits. The statement that "siding" was complete, a representation about a current or past fact, influenced Plaintiffs' decision to authorize a progress payment. *See, In re Cline*, 639 B.R. at 460 ("The test for materiality is whether the statement was *capable of influencing*, or had a natural tendency to influence, the Plaintiff's decision" (quoting *United States v. Keefer*, 799 F.2d 1115, 1127 (6th Cir. 1986)(alteration omitted)(internal quotation marks omitted)); *see also St. Clair Vill., II, LLC v. Keefer* (*In re Keefer*), 2008 WL 4279882 at *3,

2008 Bankr. LEXIS 4573 at *10 (Bankr. N.D. Ohio Sept. 15, 2008)(Whipple, J.).[13] Plaintiffs have met their burden of proving this was a material representation. Plaintiffs must also prove this representation that the completion of "siding" was false by a preponderance of the evidence.

This representation is difficult to disprove due to its generality. Plaintiffs testified after the third draw the "siding" consisting of the "whole outside should have been completed and it was not," which included stone on the exterior of the house. (S. Rable Test., 10:09:29–10:05). There are two main problems with the proof regarding the alleged falsity of this representation.

First, the testimony presented failed to offer an unequivocal account of whether the term "siding" encompassed the stone components of the Bay Shore Property. Mrs. Rable's testimony, while informative, lacked the necessary specificity to answer this question. She testified after the third draw, the "whole outside should have been completed." (*Id.* at 10:09:29).

However, Mrs. Rable's testimony became muddled and unclear when she tried to clarify whether "siding" included stone. Although she confirmed that the stone "should have been completed with the exterior stuff," she also stated that "siding" did not include stone. (*Id.* at 10:09:47). This contradiction in her testimony created further ambiguity and made it difficult to determine the falsity of the representation.

Second, the testimony also failed to clarify whether the stone was to be installed only on the front of the house or around the entire lower part of the house as well. Mrs. Rable's testimony conveyed that the stone "needed to be put on the front of the house," (*id.* at 10:09:29), but she later testified the stone "that goes around the bottom of the house" was also unfinished. (*Id.* at 10:09:47). This inconsistency added to the confusion. The court finds that the testimony was inconclusive as to the extent of the "siding" work that was required to be done.

---

13/ Although Plaintiffs testified "siding" was not completed, "for [Mrs. Rable] to cut the third draw, we were ok with cutting the third one based on what he said was completed." (M. Rable Test., 11:05:00).

Defendant, on the other hand, testified he completed everything in the third draw. (Childers Test., 12:00:18). Defendant went on to explain that Plaintiffs "for some reason" thought "siding would include the stone and at that point the stone part of the house was not on, but the siding was." (*Id.* at 12:00:47). Defendant testified at the time of the third draw the exterior of the house had the "vinyl siding," but the "parts of the front that had stone, that was not done yet." (*Id.* at 12:01:03–01:38). Defendant clarified that the stone was only going to be added around the entrance of the house. (*Id.* at 12:01:21).

Defendant also explained the construction process, stating that the stone was usually done after the siding. He explained that this was because the stone needed a foundation to go up to, which the siding provided. (*Id.* at 12:01:30). Defendant made it clear that the two were not done simultaneously.

Plaintiffs testified that at the time of the third draw, the stone portion of the house should have been completed, and that the stone was supposed to go around the bottom portion of the house. Their testimony contradicted Defendant's testimony, who explained that the stone was only going on the entrance of the house and that it was done after siding.

The parties involved in the case had above-average knowledge of real estate, but they could not agree on the specifics of the agreement. The lack of clarity surrounding the issue was compounded by the lack of any documentary evidence or testimony about the prior house built by Defendant, upon which the Bay Shore Property was apparently modeled. There was no evidence provided about whether there was stone around the entire bottom portion of the house used as a model.

This court credits Defendant's detailed and consistent testimony. That said, even if this court were to assume the representations in the third draw were false, Plaintiffs have not proven

27

Defendant made these representations knowing they were false or with gross recklessness as to their truth for the reasons below.

c. Falsity

Plaintiffs must prove Defendant made a misrepresentation with either knowing falsity or with gross recklessness as to its truth. *See, In re Somogye*, 2020 WL 1519315 at \*10, 2020 Bankr. LEXIS 824 at \*26. "Knowing means having or showing awareness or understanding and includes conscious or deliberate acts. Gross recklessness is defined as conscious indifference to the consequences (of an act)." *Halpin v. Hardy* (*In re Hardy*), 553 B.R. 613, 625 (Bankr. E.D. Ky. 2016)(citations omitted)(internal quotation marks omitted)(alterations omitted)(footnote omitted). A "reckless disregard" about the veracity of a representation should be interpreted narrowly. *See, id.* ("Gross recklessness is narrowly construed."); *In re Somogye*, 2020 WL 1519315 at \*10, 2020 Bankr. LEXIS 824 at \*26–27.

Plaintiffs failed to prove by a preponderance of the evidence Defendant had an awareness or understanding that "siding" had not been completed. Plaintiffs presented little definitive evidence about the stone exterior work to be done on the Bay Shore Property. In contrast, Defendant's testimony was clear and consistent on the matter. Defendant emphasized that the siding did not include the stone portion of the house. He explained that his understanding was that the stone was to be done after the siding. This testimony strongly suggests that Defendant did not knowingly represent that the stone had been completed because his understanding was that siding did not include the stone.

Nor have Plaintiffs proven Defendant's statements about the siding, including the stone on the exterior of the house, were made with gross recklessness as to its truth. "An honest belief, however unreasonable, that the representation is true and the speaker has information to justify it has been held to be no sufficient basis for deceit." *In re Somogye*, 2020 WL 1519315 at \*10, 2020

Bankr. LEXIS 824 at *27 (citation omitted)(alterations omitted). As stated above, Defendant explained why he believed siding did not include stone. (Childers Test., 12:01:03–01:30).

This testimony suggests that there were some fundamental disagreements between the parties over the stages of construction, particularly the completion of the stone on the exterior of the house when the third progress payment was requested. This disagreement may be sufficient to prove a breach of contract, but that is not the issue here. Plaintiffs must prove Defendant represented with knowledge of its falsity or with gross recklessness as to its truth that the stone portion had been completed in order to obtain money from Plaintiffs. Plaintiffs did not meet that burden. Accordingly, this court cannot find Defendant obtained money through a material misrepresentation that he knew was false or made with gross recklessness as to its truth.

Turning back to the contractual "promises." As noted above, failure to fulfill a promise is not fraud, but a promise made with no intention to perform can be considered fraudulent. *See, In re Somogye*, 2020 WL 1519315 at *10, 2020 Bankr. LEXIS 824 at *27; *In re Cline*, 639 B.R. at 459. Plaintiffs mainly testified as to four promises they assert were made with no intent to perform. These consisted of the failure to use payments received only for the costs of the Bay Shore Property, not providing receipts, not keeping the Bay Shore Property free of liens, and failing to complete the project within seven months.[14]

Addressing first the promise that payments were only going to be used to fulfill payment obligations for the Bay Shore Property. [Doc. #1, ¶16]. Plaintiffs understood Defendant was

_____

14/ One wrinkle here is that these promises were made in the Building Contract, which was executed on January 12, 2018. Plaintiffs did not provide a down payment, deposit, or any money to begin construction. Months later, on March 27, 2018, was when Childers Construction received the first payment. Whether Defendant obtained anything *at the time* the Building Contract was executed, which contained the promises they challenge, is questionable. In any event, this court will determine whether Defendant had an intent to perform at the time the Building Contract was executed and at the time of the third draw request because the draw request incorporated the Building Contract.

responsible for all aspects of the job. This understanding[15] led them to believe that Defendant would use the monies only for the costs incurred on the Bay Shore Property. (S. Rable Test., 09:52:01–52:30); (M. Rable Test., 10:55:46). The evidence fails to establish this was an actionable representation for several reasons.

Reading the draw request and Building Contract together, neither contain any promise about the earmarking of funds, allocation of funds, or requirement that Childers Construction use the progress payments solely for subcontractors and suppliers working on the Bay Shore Property. Progress payments were allocated to different stages of construction. Nothing obligated Childers Construction to use the money from each draw request exclusively to pay for the Bay Shore Property's costs. Plaintiffs also offered no evidence that Defendant made any oral representation that the funds would only be used to pay Bay Shore Property's costs of construction. Thus, Plaintiffs' understanding that the funds would be used solely to pay for costs on the Bay Shore Property is not based on a false representation made by Defendant. *See, Pino v. Jensen* (*In re Jensen*), 2019 WL 2403105 at *5, 2019 Bankr. LEXIS 1774 at *12 (B.A.P. 10th Cir. June 7, 2019)(rejecting creditor's argument that their "impression" that the money owed was to cover materials and work that had been completed or purchased was a representation by debtor); *cf. Harris v. Foster* (*In re Foster*), 2022 WL 17254474 at *11, 2022 Bankr. LEXIS 3357 at *32 (Bankr. N.D. Ill. Nov. 28, 2022). Without a specific promise that the funds were solely for subcontractors and suppliers working on the Bay Shore Property, this aspect of the claim fails. *See, DiCorte v. Landrieu* (*In re Landrieu*), 2010 WL 971790 at *4, 2010 Bankr. LEXIS 813 (Bankr. E.D. La. Mar. 11, 2010)("Without an affirmative representation that subcontractor claims were

---

15/ Any understanding or impression is better addressed under the claim for false pretenses below. *Cf. Custer v. Dobbs* (*In re Dobbs*), 115 B.R. 258, 266 (Bankr. D. Idaho 1990).

21-03065-jpg    Doc 23    FILED 03/30/23    ENTERED 03/30/23 16:26:10    Page 30 of 49

paid, [creditor's] Complaint states a claim for simple breach of contract.").

There is case law that holds a failure to use funds for a construction project may render a debt nondischargeable. But the facts here are distinguishable.

First, some cases involve debtors obtaining funds by making specific false promises about using funds only for the project in issue. *See e.g., Pedrick v. Robey* (*In re Robey*), 2013 WL 2452178 at *3, 2013 Bankr. LEXIS 2274 at *9 (Bankr. N.D. Cal. June 4, 2013); *La. Marine Towing, LLC v. Bertrand* (*In re Bertrand*), 2011 WL 3664474 at *2, 2011 Bankr. LEXIS 3198 at *6 (Bankr. W.D. La. Aug. 19, 2011); *Crossingham Tr. v. Baines* (*In re Baines*), 337 B.R. 392, 400 (Bankr. D.N.M. 2006); *Zio Johnos, Inc. v. Ziadeh* (*In re Ziadeh*), 284 B.R. 893, 898 (Bankr. N.D. Iowa 2002)("Debtor told Mr. Khairallah that the $30,000 progress payment would be used to pay subcontractors."). However, that did not happen here.

Second, other cases involve debtors making false statements about subcontractor payments to obtain funds. *See e.g., Gadtke v. Bren* (*In re Bren*), 284 B.R. 681, 694 (Bankr. D. Minn. 2002)(mechanic's lien waivers); *Cripe v. Mathis* (*In re Mathis*), 360 B.R. 662, 667 (Bankr. C.D. Ill. 2006); *In re Green*, 416 B.R. at 658–59 (finding that the representation stating that "all amounts have been paid by the Contractor for Work for which previous Certificates of Payment were issued" was false); *Vaks v. Grenier* (*In re Grenier*), 2009 WL 763352 at *3, 2009 Bankr. LEXIS 655 at *9 (Bankr. D. Mass. Mar. 19, 2009); *Ingham Cty. v. Strojny* (*In re Strojny*), 337 B.R. 150, 156 (Bankr. W.D. Mich. 2006). Again, that is not the case here.

Third, some cases involve state law construction trust statutes that do not apply here. *See e.g., Johnstone Supply of Detroit v. Rooks* (*In re Rooks*), 2017 WL 4404272 at *10, 2017 Bankr. LEXIS 3283 at *23 (Bankr. N.D. Ohio Sept. 28, 2017)(analyzing the Michigan Builders Trust Fund Act); *Marinucci v. SG Homes Assocs., LP*, 472 B.R. 299, 311 (D. Md. 2012)("The Contract

provided that Chesapeake had to pay all subcontractors and suppliers 'all amounts due in *connection with the performance of the Contract*.' . . . In addition, the Contract incorporated the Maryland Construction Trust Statute . . . ."), *aff'd*, 718 F.3d 327 (4th Cir. 2013); *Poole v. Batson* (*In re Batson*), 568 B.R. 281, 287 (Bankr. M.D. Tenn. 2017).

Instead, the facts here are similar to two other bankruptcy cases: *Hilsman* and *Shaul*. *Oman Fam. Tr. v. Hilsman* (*In re Hilsman*), 576 B.R. 717, 724 (Bankr. M.D. Ga. 2017); *Kunda v. Shaul* (*In re Shaul*), 579 B.R. 231, 242 (Bankr. D. Or. 2017). In both *Hilsman* and *Shaul*, the creditors argued the debtor represented that funds to build the house would be used only for the creditor's house, which they alleged was false because the funds were used for other purposes. *In re Hilsman*, 576 B.R. at 725; *In re Shaul*, 579 B.R. at 242. In *Shaul*, the court rejected this argument because the use of the funds for other expenses was not contrary to the agreement between the parties. *In re Shaul*, 579 B.R. at 242. Thus, no such representation had been made. *See, id.* Likewise, in *Hilsman*, the court rejected this argument by pointing to the contract between the parties, noting that there was nothing in the contract or the draw schedule that required the debtor's company to apply the payments solely to the cost of the house. *In re Hilsman*, 576 B.R. at 725. Thus, *Hilsman* held that the debtor had not represented that the funds would be used solely to pay expenses incurred in constructing the house. *See, id.*

Like this case, both *Hilsman* and *Shaul* involved contracts that did not contain any statement or requirement that the funds would be used exclusively to pay the costs of constructing the house. *See, id.*; *In re Shaul*, 579 B.R. at 242; *see also, Levitsky v. McPherson* (*In re McPherson*), 564 B.R. 6, 16 (Bankr. D. Mass. 2017)("But nothing in the Construction Agreement required the Debtor to use the funds paid to him under the agreement for the project. Once paid to him, the money belonged to the Debtor."); *Kun Zhao v. Lauzon* (*In re Lauzon*), 2012 WL

32

1192800 at *8, 2012 Bankr. LEXIS 1570 at *22 (Bankr. D. Mass. Apr. 9, 2012)(finding that the plaintiffs established no false representations because the payment schedule "did not earmark payments for particular tasks and materials"); *Owen v. Angst* (*In re Angst*), 428 B.R. 776, 790 (Bankr. N.D. Ohio 2010)("[T]he parties here did not stipulate that Debtor represented to Plaintiff that any payment would be used for any particular purpose."); *DeGuzman v. Hawk* (*In re Hawk*), 2006 WL 6589750 at *14, 2006 Bankr. LEXIS 4690 at *36 (Bankr. S.D. Cal. Sept. 27, 2006)("[T]here is no showing that Mr. Hawk induced them to part with the funds while intending not to use them for the stated purpose."); *Simons v. Kolwitz* (*In re K Props., LLC*), 2010 WL 2169485 at *4, 2010 Bankr. LEXIS 1812 at *11 (Bankr. D. Or. May 27, 2010)("Both the Defendant and the Plaintiffs' expert witness testified that the practice [of applying immediately available funds to the most immediate demands of creditors, even if the funds and the demands being met were attributable to different contracts or projects] is not uncommon in the construction business.").

Here, no evidence was presented of any obligation or representation restricting the use of the payments solely to the cost of the Bay Shore Property. Thus, Plaintiffs have not met their burden of proving that Defendant's alleged promise that the funds were only going to be used for the Bay Shore Property was made with knowledge of its falsity or gross recklessness as to its truth.

Next, the court will address the promise to provide receipts. (S. Rable Test., 10:05:15); (M. Rable Test., 10:58:59). The fifth paragraph of the Building Contract provides the contractor "will provide all documentation necessary to provide proof of payment." [Doc. #1, Ex. A, p. 6]. Plaintiffs testified Defendant never provided any receipts. (M. Rable Test., 11:03:55). Although this is some proof Defendant never intended to perform this obligation to provide receipts, Plaintiffs' theory falls short because progress payments did not depend on providing receipts or

33

proof of payment.

Each draw request certified that a stage of construction "in the above referenced Building Contract" had been completed resulting, in a progress payment becoming due. (Pls.' Trial Ex. F). Even if this court reads the draw requests alongside the Building Contract, *see, New Lansing Gardens Hous. Ltd. P'ship*, 46 F.4th at 522, this promise is not actionable because "the draws under the parties' contract were not dependent on providing proof of payment of invoices incurred before the previous draw." *Taylor v. Allen* (*In re Allen*), 2011 WL 1048241 at *6, 2011 Bankr. LEXIS 1012 at *19 (Bankr. E.D. Tenn. Mar. 18, 2011). In *Allen*, the court rejected the creditor's argument that the failure to provide "proof of payment" formed a false representation because the contract "expressly provides that specific draw amounts will be paid at various stages of construction; no provision states as a condition precedent to a draw that an expense incurred prior to that time must have been paid in full." 2011 WL 1048241 at *7, 2011 Bankr. LEXIS 1012 at *19. As in *Allen*, the Building Contract expressly provided that amounts would be paid at various stages of construction, rather than being dependent on proof of payment. Plaintiffs also failed to prove they requested receipts for each draw. While Plaintiffs did request receipts after the third draw, (S. Rable Test., 10:05:15), they still paid the first three draws without requiring any prior proof of payment.[16]

Finally, there are the promises to keep the Bay Shore Property free of liens and completing the project within seven months. (S. Rable Test., 09:52:52–53:51). Plaintiffs have not met their burden of proving these promises were made with an intent not to perform. Childers Construction

---

16/ The failure to request receipts is also relevant to Plaintiffs' "justifiable reliance" discussed below. *See e.g., Copper v. Lemke* (*In re Lemke*), 423 B.R. 917, 924 (B.A.P. 10th Cir. 2010)(affirming bankruptcy court's finding that the creditor's reliance on the draw requests was not justifiable because the creditor failed to "require that receipts or estimates be supplied to support the draw requests").

paid most of the expenses incurred during construction. The evidence also fails to show that Defendant submitted the third draw knowing liens would be filed. For example, the court found credible Defendant's testimony that he told a salesperson at Carter Lumber to wait to deposit a check until he had the fourth progress payment from Plaintiffs. (Childers Test., 12:52:13). Similarly, Defendant stated he intended to complete the project within the allotted time, despite a delay in acquiring the permit caused by zoning and flood plain issues. (*Id.* at 12:08:24). Also, the third progress payment was not made until three weeks after it was requested, which may have contributed to any delay. Moreover, to prevail, Plaintiffs would need to show a lack of intent to meet the schedule at the time the Building Contract was entered into. This they did not do.

For these reasons, and the reasons below,[17] this court finds that Plaintiffs have not proven by a preponderance of the evidence that Defendant's alleged representations are actionable under §523(a)(2)(A).

### ii. Intent to Deceive

The second prong under *Rembert* requires Plaintiffs to prove by a preponderance of the evidence that Defendant intended to deceive Plaintiffs. Assuming Defendant made any of the representations with knowledge of their falsity or with gross recklessness as to their truth, Plaintiffs have not met their burden of proving Defendant held an intent to deceive Plaintiffs by a preponderance of the evidence.

Under this prong, the inquiry is whether lies and falsehoods were made to a creditor with the intention that the lie or falsehood be considered true. *See, In re Somogye*, 2020 WL 1519315

---

17/ As noted by the bankruptcy courts in *Somogye*, *Detweiler*, and *Copeland*, proving a debtor's intent to defraud under *Rembert* is similar to proving a debtor's knowledge or recklessness as to the falsity of the representations made. *In re Somogye*, 2020 WL 1519315 at *12 n.2, 2020 Bankr. LEXIS 824 at *34 n.2 (explaining that the Sixth Circuit has equated the two concepts in cases brought under §523(a)(2)(B)); *Sequatchie Mt. Creditors v. Lile* (*In re Detweiler*), 2017 WL 650062 at *15, 2017 Bankr. LEXIS 456 at *43 (Bankr. N.D. Ohio Feb. 16, 2017)("Proving the element of intent is similar to proving Debtor's knowledge and/or recklessness." (citing *In re Copeland*, 291 B.R. at 766)).

at *12, 2020 Bankr. LEXIS 284 at *34 ("The element of intent to deceive is the heart of the §523(a)(2)(A) exception to discharge . . . . [T]he chaff of breach of contract and negligent performance is separated from the wheat of fraud by whether the speaker intended to deceive the listener.").

"A broken promise alone will not establish the existence of any intent to deceive." *See, In re Hunter*, 535 B.R. at 213; *see also, Strominger v. Giquinto* (*In re Giquinto*), 388 B.R. 152, 166 (Bankr. E.D. Pa. 2008)("It is a matter of well-entrenched jurisprudence that a contractor's failure to perform as promised, standing alone, gives rise to a case for breach of contract, not actionable fraud, misrepresentation or false pretenses under §523(a)(2)(A).").  Instead, intent to deceive is measured by a subjective standard and must be determined by the totality of the circumstances. *See, Rembert*, 141 F.3d at 281; *see also, In re Somogye*, 2020 WL 1519315 at *13 202 Bankr. LEXIS 284 at *34–35 ("A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's 'course of conduct,' as direct proof of intent will rarely be available." (citing *Hamo v. Wilson* (*In re Hamo*), 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999))).  But "if there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *In re Mann*, 646 B.R. at 456; *ITT Fin. Servs. v. Szczepanski* (*In re Szczepanski*), 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

Accordingly, the question here is whether the totality of the circumstances reflect Defendant's intent to deceive Plaintiffs.  Generally, a useful indicator of fraudulent intent, especially in situations involving a debtor-contractor, is whether a debtor-contractor undertook any of the steps necessary to perform as promised. *See, Siebanoller v. Rahrig* (*In re Rahrig*), 373 B.R. 829, 834 (Bankr. N.D. Ohio 2007)(Speer, J.)("Thus, as a general rule, this Court has observed that the greater the extent of a debtor's performance, the less likely it will be that they possessed an

intent to defraud."); *Mack v. Mills* (*In re Mills*), 345 B.R. 598, 605 (Bankr. N.D. Ohio 2006). An inverse relationship is used: intent to deceive may be found when a debtor takes no significant measures toward the performance of an obligation; inferences of fraud are muted if the debtor undertakes significant steps to perform as promised. *See, In re Rahrig*, 373 B.R. at 834.

The totality of the circumstances do not reflect that Defendant had an intent to deceive. Plaintiffs hired Defendant to build a personal home. (Childers Test., 11:54:25). Jeff Savage, the owner of Toledo Transformation and Plaintiffs' brother-in-law, referred Defendant to Plaintiffs. Defendant did not advertise or solicit to obtain the work. From January to August 2018, Childers Construction completed extensive work, including rezoning, obtaining a permit, ordering materials, (*id.* at 12:57:06), hiring subcontractors, and completing the basic structure of the house, albeit with some work remaining. (*Id.* at 12:08:44). Uncompensated work was performed until March 27, 2018. There were periods when then project was on schedule, and when the parties had their falling out a substantial portion of the house was complete. (*Id.* at 12:06:07, 12:08:44). Defendant did not take money upfront and then not perform. As in *In re Rahrig* and *In re Somogye*, "under this type of inquiry the facts bend strongly away from the existence of any intentional wrongdoing on the part of the Defendant." *In re Somogye*, 2020 WL 1519315 at *13, 2020 Bankr. LEXIS 824 at *36 (alteration omitted)(quoting *In re Rahrig*, 373 B.R. at 834).

Defendant continued to work after the third progress payment. *See, In re Landrieu*, 2010 WL 971790 at *8 ("To establish fraud, [creditor] must prove that at the time the third progress payment was made, Debtor had no intention of performing under the Agreement.").

Moreover, Plaintiffs presented little evidence of fraudulent intent on the part of Defendant concerning the completion of the project. Plaintiffs did not believe 70% of the work was completed at the time of the third request for payment, (S. Rable Test., 10:04:35, 10:08:52), but

work continued after that. (Childers Test., 12:09:18–10:10). In June 2018, the project began to lose momentum and some contractors were not showing up. (S. Rable Test., 10:10:15). Defendant informed Plaintiffs that workers were present at the Bay Shore Property when they were not, after assuring them they would be. When Defendant requested the fourth progress payment, Plaintiffs testified Childers Construction had not finished the trim, door, cabinets, and other finish work. (*Id.* at 10:08:18). Defendant tried to complete, but did not finish, these construction items. (Childers Test., 12:19:43). This contractual performance after the third draw does not paint the portrait of a contractor who had no intentions of living up to his contractual obligations. *See, In re Rahrig*, 373 B.R. at 834; *In re Mills*, 345 B.R. at 605. Running out of money, standing alone, is not fraud.

Plaintiffs refused to provide the fourth progress payment until Defendant provided receipts. (*Id.* at 11:03:55). The relationship ended because Defendant did not keep receipts, (Childers Test., 12:54:33), and he would not continue working unless Plaintiffs provided the fourth progress payment.

The failure to provide receipts is a violation of the terms of the parties' Building Contract. "But this is not an objection to discharge based on failure to explain the loss of assets or failure to keep records." *Verbelia v. Metcalf* (*In re Metcalf*), 2014 WL 6871541 at *24, 2014 Bankr. LEXIS 4895 at *66–67 (Bankr. E.D. Tenn. Dec. 3, 2014).

Defendant did not finish the construction of the home, and stopped working in August 2018, about two months after the third progress payment. "But there is no evidence from which the court can find that he did not intend from the outset to complete . . . the project." *In re Somogye*, 2020 WL 1519315 at *14, 2020 Bankr. LEXIS 824 at *37. The relationship ended somewhat ambiguously, and Plaintiffs could not recall if they had explicitly told Childers Construction not to come back to work on the project. (S. Rable Test., 10:43:08). Defendant stated that he failed to

understand why things went sour despite ongoing work. (Childers Test., 12:56:47).

Specifically, Plaintiffs argued Defendant's intent to deceive is evidenced in two situations, one involves the purchase of materials from Carter Lumber, and the other involves the use of the funds in the third draw after the project stalled. Both involve how funds advanced were spent.

The first situation is the purchase of materials from Carter Lumber. Plaintiffs argued the failure to pay for the framing materials purchased from Carter Lumber with the third progress payment evidences an intent to deceive. The evidence showed Defendant purchased $46,795.00 of materials from Carter Lumber on April 30, 2018, using the ninety-day account. (Childers Test., 12:05:05). The $46,963.59 check was post-dated for August 1, 2018, around ninety days after the purchase. Defendant believed he would receive the fourth progress payment in August and instructed Carter Lumber to hold onto the check before depositing to ensure that the account had sufficient funds. (*Id.* at 12:52:13).

These facts are similar to *Gadtke v. Bren* (*In re Bren*), 284 B.R. 681, 692–95 (Bankr. D. Minn. 2002). In *Bren*, debtor received lien waivers by tendering checks to subcontractors and informing them to "wait before depositing the check to make sure the [] bank accounts contained sufficient sums." *Id.* at 692. Because the checks subcontractors received were returned due to insufficient funds, creditors claimed debtor fraudulently induced them to make further payments based on the false lien waivers stating subcontractors had been paid. *See, id.* The court held the debtor would have to know or intend that the checks would not be honored for there to be fraud. *See, id.* at 693. The bankruptcy court then found the practice of informing subcontractors to wait before depositing checks did not preclude the valid intention to pay subcontractors because the debtor had a history asking subcontractors to wait before depositing checks and usually made good on the checks that were eventually honored. *See, id.* at 693–94. Therefore, the debtor in *Bren* did

39

not have an intent to deceive. *See, id.*

As in *Bren*, Defendant's testimony reflects a subjective intent to fulfill his obligation to Carter Lumber. Defendant's failure to pay Carter Lumber at the time of the third draw does not preclude a finding of a subjective intent to pay Carter Lumber in the future. *See, id.* Defendant testified he "did not get paid from the Rables and I did not pay Carter [Lumber]." (Childers Test., 12:10:23). The totality of the circumstances do not a support a finding that Defendant did not intend to pay subcontractors. For example, Defendant's actions in tendering a check to Palmer Excavation that was returned twice before it was ultimately paid,[18] and tendering a post-dated check to Carter Lumber for the full amount of the costs of the materials is some evidence that he had a subjective intent to pay for the materials out of his future cash flow. Defendant's testimony that a payment of $1,500.00 was made to Carter Lumber after the fourth draw was rejected is also evidence in Defendant's favor. Accordingly, the court cannot find that Defendant submitted the third draw without a subjective intent to ultimately fulfill his obligation with Carter Lumber.

The second situation Plaintiffs point to is the general use of the funds in the third draw. As in *Mills*, the gist of Plaintiffs' argument is that an inference of an intent to deceive may be drawn because Defendant was "robbing Peter to pay Paul." *See, In re Mills*, 345 B.R. at 606. But as Judge Speer recognized, using funds from one project to pay for another is a common practice for businesses facing insolvency. *Id.* "Obviously, such a practice cannot be condoned. Yet, alone, such a practice does not establish that a debtor acted with the intent to defraud." *Id.* The crucial factor is the "debtor's subjective intent at the time when they were allocating the funds received from one project to pay for the other. Ergo, if done as a stopgap measure for the express purpose of salvaging the business, then regardless of the soundness of the business decision, it cannot be

---

[18] Like in *Bren*, the checks subcontractors received were returned to Childers Construction due to insufficient funds.

viewed as fraudulent." *Id.*; *see also, Peoples State Bank v. Crim* (*In re Crim*), 149 F. App'x 427, 431 (6th Cir. 2005); *Regions Bank v. Faulk* (*In re Faulk*), 2006 WL 1999131 at *7, 2006 Bankr. LEXIS 1426 at *22 (Bankr. M.D. Ala. July 14, 2006)(recognizing the debtor's use of the bank account for purposes other than the construction loans "had been a common practice for him during the course of his nine construction loans with the bank"); *cf. In re Mathis*, 360 B.R. at 668 (noting that the construction funds did not belong to the creditors once they were deposited in the debtor's business account); *In re Shaul*, 579 B.R. at 242 ("Plaintiff's understanding that the funds would be used only on her project, while understandable, did not turn the payment into a trust."); *In re Metcalf*, 2014 WL 6871541 at *24, 2014 Bankr. LEXIS 4895 at *65–66; *In re Bren*, 284 B.R. at 693.

Although payments were made to pay expenses on other projects, Plaintiffs testified some subcontractors working on the Bay Shore Property were eventually paid. (S. Rable Test., 10:21:32–21:45). Defendant's act of paying some contractors weighs against finding a lack of subjective intent to ultimately pay the obligations to Carter Lumber and Universal Marble & Granite, LLC, the two remaining obligations owed.

As discussed above, Defendant did not represent that he would use the progress payments only for the costs of the Bay Shore Property, *see e.g., In re Batson*, 568 B.R. at 288; *In re Ziadeh*, 284 B.R. at 898, nor did the Building Contract specify how payments were required to be used. *See e.g., In re Lauzon*, 2012 WL 1192800 at *8, 2012 Bankr. LEXIS 1570 at *22; *In re Hawk*, 2006 WL 6589750 at *14, 2006 Bankr. LEXIS 4690 at *36; *In re Bren*, 284 B.R. at 691. Plaintiffs offered no evidence that Defendant promised to use the payments only for their project. Again, absent "such a promise, either in the Construction Agreement or in other statements, the [creditors] have no basis to obtain a finding of fraud." *In re McPherson*, 564 B.R. at 17.

Even if Defendant had represented funds received would only be used for the Bay Shore Property, using some of the funds for other projects generally does not evidence an intent to deceive. Defendant used some, but not all, of the funds from the third draw to pay subcontractors who had worked on the Bay Shore Property. (S. Rable Test., 10:06:12). To the extent other subcontractors had not been paid, the totality of the circumstances do not reflect that Defendant lacked a subjective intent to pay them at some point the future.

Further, while Defendant testified that he did not know that the Bay Shore Property was owned by Toledo Transformation, he did know that the Grand Bay property was owned by Toledo Transformation. In addition, the checks that were issued to Childers Construction were from Toledo Transformation. Much of Plaintiffs' evidence of Defendant's alleged wrongful conduct was that Toledo Transformation's monies were being used for Grand Bay, which it owned.

Accordingly, Plaintiffs have failed to prove by a preponderance of the evidence that Defendant had the necessary intent to deceive.

### iii. Justifiable Reliance

Having decided that Plaintiffs have failed to prove Defendant made misrepresentations knowingly or recklessly and with an intent to deceive them, the remaining prongs of proof required by the Sixth Circuit in *Rembert* are not essential to rendering judgment. That said, the court will briefly address the element of justifiable reliance.

Section 523(a)(2)(A) requires the less demanding level of "justifiable, but not reasonable, reliance" on a debtor's misrepresentations. *In re Mann*, 646 B.R. at 460 (citation omitted). A creditor must show actual reliance on a debtor's misrepresentations, and that such reliance was justifiable based on the facts and "circumstances of the particular case." *See id.* ("The Ninth Circuit Court of Appeals, in a case that was cited favorably by the Supreme Court in *Field v. Mans*, explained that 'justifiable reliance' is a subjective standard that takes into account a variety of

21-03065-jpg    Doc 23    FILED 03/30/23    ENTERED 03/30/23 16:26:10    Page 42 of 49

factors, such as 'special knowledge, experience, and competence.'" (citation omitted)(alteration omitted)).

But "justifiability is not without some limits." *In re Somogye*, 2020 WL 1519315 at *12, 2020 Bankr. LEXIS 824 at *46 (alteration omitted). "Reliance is not justifiable if the creditor blindly turns their eyes away from things which would have clearly shown that any reliance on the debtor's representations was misplaced." *Id.* (citation omitted)(alteration omitted). Although a creditor cannot blindly rely on a patently false statement, a creditor is justified in relying on a representation of fact even if it might have determined the falsity of the representation had it made an investigation. *Field*, 516 U.S. at 71.

Here, the element of justifiable reliance is a difficulty for Plaintiffs. First, Plaintiffs were relatively sophisticated creditors, not novices in the real estate development arena. They had extensive experience in this field. Mr. Rable, a licensed realtor, assisted Toledo Transformation in purchasing rental properties and occasionally sold one of their homes. (M. Rable Test., 11:11:15). Mrs. Rable owned two real estate development companies. (S. Rable Test., 10:40:35). One of Mrs. Rable's companies also served as Toledo Transformation's bookkeeper, and it oversaw the payments to Childers Construction for building the Grand Bay property and the Bay Shore Property, which were both funded by Toledo Transformation. Under these circumstances, there is some difficulty in concluding Plaintiffs were justified in relying on any alleged representations by Defendant.

In *Laraway*, for instance, creditors were not presented with circumstances, such as subcontractors going unpaid, which would have served as a warning that they were being deceived. *See, Welch v. Laraway* (*In re Laraway*), 2010 WL 3703272 at *8, 2010 Bankr. LEXIS 3041 at *26–27 (Bankr. D. Idaho Sept. 13, 2010). Unlike *Laraway*, Plaintiffs here testified that they saw

43

"where this project was heading," (M. Rable Test., 11:03:00), around the time of the third draw. Plaintiffs bumped into the roofer that stated they were not getting paid. (S. Rable Test., 10:06:12). Plaintiffs also had a feeling money was being used to complete the Grand Bay property that was also being built for Toledo Transformation. (*Id.* at 10:55:46). Mrs. Rable, working as Toledo Transformation's bookkeeper, had special knowledge of this information because she was providing the money for both projects.

Second, Plaintiffs did not own the Bay Shore Property at the time of construction. Toledo Transformation was the owner. Defendant filed a lien on September 19, 2018, and Carter Lumber filed a lien on October 4, 2018. Although Plaintiffs claimed they knew nothing about Carter Lumber's lien, (Def's. Trial Exs. 1, 2), Toledo Transformation conveyed the Bay Shore Property to Mrs. Rable on October 11, 2018, by quitclaim deed. (Def's. Trial Ex. 3); (Pls.' Trial Ex. C).

Toledo Transformation testified by affidavit it did not have notice the lien was filed. (Def's. Ex. 3). On October 15, 2018, Plaintiffs granted Toledo Transformation a mortgage on the Bay Shore Property to secure a "handshake agreement" to pay $395,000.00 to Toledo Transformation. But Mr. Rable stated this was not an "official mortgage," and it was not recorded as a lien[19] on the Bay Shore Property. (M. Rable Test., 10:53:40, 11:13:10). Plaintiff stated that the reason Toledo Transformation took a mortgage and used $395,000.00 as the amount secured was to protect Toledo Transformation. (*Id.* at 11:13:40, 11:18:26). Given these facts, it is unclear how Plaintiffs can allege Defendant fraudulently induced them to part with money when they accepted the Bay Shore Property from Toledo Transformation with preexisting liens. *See, Field*, 516 U.S. 70 (stating a buyer's reliance on a seller's representation that land is free of encumbrances is justifiable even

---

19/  This testimony does appear to accurately state the status of the mortgage, at least at present. The title report for the foreclosure action reflects the mortgage as being filed on record. [Doc. #1, Ex. C, p. 32]. Moreover, the copy of the mortgage given to Toledo Transformation appears to reflect that it was recorded. [Doc. #1, Ex. C, p. 41].

if the buyer could have easily learned of an unsatisfied mortgage by visiting the register of deeds office).  Here, Defendant was not the seller.  No information was provided on what representations were made in transferring the Bay Shore Property.  On the other hand, a quitclaim puts the grantee on notice that there may be defects in the title. *Finomore v. Epstein*, 18 Ohio App. 3d 88, 90–91, 481 N.E.2d 1193, 1196 (8th Dist. Ct. App. 1984).

Lastly, Plaintiffs emphasize the lack of receipts.  Although they fault Defendant for failing to provide receipts to support the draw requests, Plaintiffs failed to require Defendant to provide receipts before making progress payments. *See, In re Lemke*, 423 B.R. at 924 (affirming the bankruptcy court's conclusion that creditor's reliance was not justified because of their own failure to require receipts to support the draw requests).  Plaintiffs only demanded receipts *after* the third draw, even though Plaintiffs had information before the third draw that a subcontractor had not been paid, and they suspected that Defendant was using funds for Toledo Transformation's other project. (S. Rable Test., 10:05:15); (M. Rable Test., 11:03:45).  Plaintiffs' failure to require receipts prior to the third draw raises questions about their reliance on Defendant's alleged representations.

In light of these issues, Plaintiffs' claim of justifiable reliance fails.  Plaintiffs were sophisticated creditors who failed to act on information they had or conduct due diligence, failed to require receipts to support the three draw requests that were paid, and then purchased the Bay Shore Property with preexisting liens.

### B.  False Pretenses

False pretenses include any intentional fraud or deceit that may be implied from a series of events, activities, conduct, or communications which, when considered collectively, are purposely calculated and intended to create a misleading understanding of a transaction in which a creditor is wrongly induced to extend money, property, services, or credit to the debtor. *See, Fuller v.*

*Givens* (*In re Givens*), 634 B.R. 755, 761–62 (Bankr. E.D. Tenn. 2021); *see also, Rezin v. Barr* (*In re Barr*), 194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996)("A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor." (citation omitted)); *James v. McCoy* (*In re McCoy*), 114 B.R. 489, 489 (Bankr. S.D. Ohio 1990)("A false pretense has been defined to include a 'mute charade,' where the debtor's conduct is designed to convey an impression without oral representation."); *Strait & Lamp Grp. v. Moldovan* (*In re Moldovan*), 636 B.R. 491, 502 (Bankr. S.D. Ohio 2021). "False pretenses may arise when the circumstances imply a particular set of facts, and one party knows the facts to be otherwise but does not correct the counter-party's false impression." *Dewitt v. Stewart* (*In re Stewart*), 948 F.3d 509, 520 (1st Cir. 2020)(citation omitted)(internal quotation marks omitted).

Plaintiffs testified Defendant used their project's funds to complete other projects, despite their understanding that the money would be solely used for their project. (M. Rable Test., 10:55:46); (S. Rable Test., 09:51:01). While their testimony lacked specific details about the actions and conduct that amounted to false pretenses, their testimony suggested Defendant's conduct and actions created a misleading understanding of what the project entailed. *See e.g., Medlock v. Meahyen* (*In re Meahyen*), 422 B.R. 192, 203 (Bankr. D. Minn. 2010)("As the projects went on, the defendant's words and conduct were intended to induce the plaintiff to continue paying him under the false belief that subcontractors were being paid and work was being completed.").

For example, sometime after the third progress payment, Defendant informed Plaintiffs workers would be there on a certain day. When the workers did not show up, Plaintiffs called

46

Defendant to notify him that no one was at the Bay Shore Property. During this conversation, Defendant reassured Plaintiffs workers were at the Bay Shore Property. In fact, Plaintiffs were physically at the Bay Shore Property and informed Defendant nobody was there. (M. Rable Test., 11:03:00).

However, Plaintiffs did not meet their burden of proving Defendant had an intent to deceive by a preponderance of the evidence. *See, In re Moldovan*, 636 B.R. at 502. For essentially the same reasons set forth above, this court cannot conclude that Defendant intended to deceive Plaintiffs. Furthermore, even if these facts constituted false pretenses, Defendant did not get any more money from Plaintiffs, or any money directly from Plaintiffs at all. The funds were "extended" by Toledo Transformation. Similarly, since this event took place after the third progress payment—the last monies Childers Construction received—these facts do not necessarily indicate that Defendant lacked the intention to pay contractors and finish the project at the time of the third draw. *See, Muhammad v. Sneed* (*In re Sneed*), 543 B.R. 848, 862 (Bankr. N.D. Ill. 2015)("Subsequent acts of fraud or omissions do not demonstrate that the debtor had the requisite intent at the time the representations were made."). Accordingly, Plaintiffs have failed to satisfy their burden of proof, having failed to show any deliberate intent to mislead Plaintiffs that resulted in monies being paid. Nor have they show that Plaintiffs were the parties who were "wrongly induced to extend money" to Defendant.

### C. Actual Fraud

"'Actual fraud' has two parts: actual and fraud." *Husky*, 578 U.S. at 360. The word "actual," in the context of common-law fraud, denotes any fraud that involves moral turpitude or intentional wrong. *Id.* (quoting *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878)); *Field*, 516 U.S. at 69 (holding that the word "fraud" contains the elements ascribed to it at common law). The word "fraud" encompasses all the multifarious means that human ingenuity can design to gain an

47

advantage over another, making a rigid and precise definition not only useless, but essentially unworkable. *See, Husky*, 578 U.S. at 360; *see also, In re Hunter*, 535 B.R. at 213. Accordingly, anything that counts as "fraud" and that is done with wrongful intent is "actual fraud." *Husky*, 578 U.S. at 360.

This "actual fraud" prong is broadly defined and includes any deceit, artifice, trick, or design involving a direct and active operation of the mind, used to circumvent and cheat another. *In re Vitanovich*, 259 B.R. at 877; 4 Collier on Bankruptcy ¶523.08[1] (Richard Levin & Henry J. Sommer eds., 16th ed.). Thus, "actual fraud," requires an intent to deceive or defraud. *See, Husky*, 578 U.S. at 360; *see also, In re Hunter*, 535 B.R. at 213 (quoting *Gerad v. Cole* (*In re Cole*), 164 B.R. 951, 953 (Bankr. N.D. Ohio 1993)).

For essentially the same reasons set forth above, Plaintiffs have failed to support their claim for "actual fraud" by establishing that Defendant intended to deceive or cheat them. *See e.g., In re Somogye*, 2020 WL 1519315 at *15, 2020 Bankr. LEXIS 824 at *42–43 ("There is no evidence, for example, that he was working on other projects where any excess shingles could have been diverted.").

For all these reasons, the court finds Plaintiffs have not proven by a preponderance of the evidence that any debt Defendant owes them is nondischargeable under §523(a)(2)(A).

### III.    <u>11 U.S.C. §523(a)(6)</u>

Section 523(a)(6) "excepts from the discharge any debt for 'willful and malicious injury by the debtor to another entity or to the property of another entity.'" *CMCO Mortg., LLC v. Hill* (*In re Hill*), 957 F.3d 704, 712 (6th Cir. 2020); *see also Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)(noting the statutory language of §523(a)(6) excepts debts from discharge that result from intentional torts). A creditor must prove that the injury was both "willful" and "malicious." *See, MarketGraphics Rsch. Grp., Inc. v. Berge* (*In re Berge*), 953 F.3d 907, 915 (6th Cir. 2020) ("As

48

text and precedent thus reflect, assessing whether an injury is 'willful and malicious' under §523(a)(6) is a two-pronged inquiry.").  The word "willful" modifies the word "injury," indicating a specific or actual intent to injure is required. *See, id.*; *see also, In re Doll*, 585 B.R. at 455.  A "malicious injury" is generally defined as conduct done without just cause or excuse or for which there is no reasonable justification. *See, In re Berge*, 953 F.3d at 915; *Doe v. Boland* (*In re Boland*), 946 F.3d 335, 338 (6th Cir. 2020).

The Supreme Court in *Geiger* emphasized "a debtor might act intentionally but simply not know that the act will cause injury" in cases involving "negligence" or a "knowing breach of contract," which would be insufficient for purposes of nondischargeability. *Geiger*, 523 U.S. at 62; *In re Boland*, 946 F.3d at 338.  Therefore, to succeed in a §523(a)(6) action, a creditor must show that a debtor knew the injury would result from his actions. *Geiger*, 523 U.S. at 62.

There was no evidence presented which could support a finding of a willful and malicious injury.  Indeed, Plaintiffs did not even mention §523(a)(6) in closing arguments.  Plaintiffs thus failed to meet their burden of proving by a preponderance of the evidence that the damages, including the liens filed on the Bay Shore Property, stem from willful and malicious conduct on the part of Defendant.

For all of the above reasons, Plaintiffs have not met their burden of proving any debt is excepted from discharge under §523(a)(2)(A) or §523(a)(6) by a preponderance of the evidence.  Therefore, their request for attorney fees in their Complaint must also be denied.

## CONCLUSION

The court finds for Defendant on Plaintiffs' nondischargeability Adversary Complaint and will enter a separate judgment in his favor in accordance with this Memorandum of Decision.